S10Q0203. ANTHONY et al. v. AMERICAN GENERAL
FINANCIAL SERVICES, INC. et al.

(697 SE2d 166)

NAHMIAS, Justice.

The United States Court of Appeals for the Eleventh Circuit has certified to this Court four questions of Georgia law relating to a lawsuit filed by Terry and Sarah Anthony in federal court to recover for notary fees charged by American General Financial Services that allegedly exceeded the statutory maximum permitted by OCGA § 45-17-11 (b). See *Anthony v. American General Financial Svcs.*, 583 F3d 1302, 1307 (11th Cir. 2009).

According to their complaint, the Anthonys refinanced a mortgage loan with American General in 2002, executing a standard loan

agreement that specified certain fees required as part of the transaction, including a $350 "Notary Fee."[1] Although the agreement stated that the fees were "reasonable and necessary," OCGA § 45-17-11 (b) sets the maximum lawful fee for any notarial service at $4.00. OCGA § 45-17-11 (d) requires that the person requesting a notarial act be informed of the statutory fee permitted before performance of the act, but the Anthonys allegedly received no such notice and American General collected the $350 fee.

In 2007, the Anthonys filed suit against American General in the federal district court for the Northern District of Georgia, asserting a cause of action under OCGA § 45-17-11, along with claims for breach of contract, fraud, and money had and received. The district court granted American General's motion to dismiss for failure to state a claim, see Federal Rule of Civil Procedure 12 (b) (6), and the Anthonys appealed. The Eleventh Circuit then certified its four questions to this Court, which we will address in order.

1. The first certified question asks, "[i]s a corporation employing notaries public to help facilitate its lending practices: A) subject directly to [OCGA] section 45-17-11; or B) vicariously liable for violations of section 45-17-11 by its notary employees?" The answer to both parts of that question is no, although a corporation may be liable as a party to or participant in a violation of the statute by a notary.

(a) Subsection (a) of OCGA § 45-17-11 sets forth "[t]he fees *of notaries public*" as $2.00 per specified act. Subsection (b) provides, in relevant part, that "[i]t shall not be lawful *for any notary public* to charge a greater sum than $4.00 for each service performed," which includes the $2.00 fee for the notarial act plus a "$2.00 fee for an attendance to make proof as a notary public" and for a certification if required. Subsection (c) provides that *"[a] notary public* need not charge fees for notarial acts." Finally, subsection (d) states that *"[a] notary public* shall inform the person requesting any notarial act, prior to performing the act, the fees permitted for each act."

Given this statutory text, it is clear that the General Assembly intended OCGA § 45-17-11 to protect consumers of notarial services by establishing the maximum fee that a notary can charge and by requiring notification to consumers of the maximum fee. But the emphasized portions of each subsection of the statute make it

---

[1] In its brief, American General asserts that if the case proceeded to discovery, the evidence would show that the use of this term in the loan documents was "an inadvertent and isolated labeling error" and that the amount represented "other valid fees and costs." As the matter was before the district court on a motion to dismiss, however, the factual allegations of the complaint are taken as true. See *Cooper v. Pate*, 378 U. S. 546, 546 (84 SC 1733, 12 LE2d 1030) (1964).

equally clear that consumers were directly protected *against* "notary public[s]," not anyone else. And it is also clear that a corporation cannot serve as a notary public. The statute requires an applicant for appointment as a notary public to be an "individual" more than 18 years old, "a United States citizen or . . . a legal resident of the United States," and "able to read and write the English language," OCGA § 45-17-2 (a) (1), (2) and (5), making it apparent that a notary must be a human being, not a corporate entity. This is also apparent from the nature of a notarial act as defined in the statute. See OCGA § 45-17-1 (2) (" 'Notarial act' means any act that a notary public is authorized by law to perform and includes, without limitation, attestation, the taking of an acknowledgment, the administration of an oath or affirmation, the taking of a verification upon an oath or affirmation, and the certification of a copy.").

We therefore answer the first part of the first certified question "no": under the plain and unambiguous language of Georgia's notary statute, corporations employing notaries public are not subject directly to OCGA § 45-17-11. See *Chase v. State*, 285 Ga. 693, 695 (681 SE2d 116) (2009) (" '[W]here the language of a statute is plain and unambiguous, judicial construction is not only unnecessary but forbidden.' " (citation omitted)). The dissent reaches the opposite conclusion by asserting that "it would defeat the clear intent of the Legislature in enacting OCGA § 45-17-11 not to hold American General directly accountable under the statute for a violation thereof." Dissenting Op. at 462. However, as shown above, the text of OCGA § 45-17-11 runs squarely against the dissent's view that its prohibitions apply directly to anyone other than notaries, and the dissent offers *no other source* for its conclusion regarding legislative intent. It may be good policy to have a law that directly protects consumers against corporations (or others) that employ notaries as well as the notaries themselves, but that is not the law that our Legislature has enacted. It is not the place of this Court to rewrite statutes to promote policies that are not expressed in that legislation — much less read into a statute a policy that contradicts the text of the law and is derived without citation to any other source.

(b) Concluding that corporations employing notaries public are not subject directly to OCGA § 45-17-11 does not end the analysis, however, because even when a statute directly applies to one person, others may become liable through other well-established legal principles. One common means of extending liability, as reflected in the second part of the first certified question, is vicarious liability, or the general rule that employers are liable for the tortious acts of their employees if done in the course of their employment. That doctrine is very broad: "it makes no difference that the [employer] did not authorize, or even know of the [employee's] act or neglect, or even if

he disapproved or forbade it, he is equally liable, if the act be done in the course of his [employee's] employment.' " *Crawford v. Johnson*, 227 Ga. App. 548, 553 (489 SE2d 552) (1997) (citation omitted).

However, this Court's venerable decision in *May v. Jones*, 88 Ga. 308 (14 SE 552) (1891), declined to apply vicarious liability to an employee acting as a notary public. There we rejected the claim that a bank employing a notary public was automatically responsible for the negligence or misconduct of the notary, explaining that

> [t]he reason is that the notary is not a mere agent or servant of the bank, but is a public officer sworn to discharge his duties properly. He is under a higher control than that of a private principal. He owes duties to the public which must be the supreme law of his conduct. Consequently when he acts in his official capacity, the bank no longer has control over him and cannot direct how his duties shall be done. If he is guilty of misfeasance in the performance of an official act, the bank is not liable. . . . That the notary is also an employee and agent of the bank does not alter the case. There is still a sharp dividing line between his duties as agent and his duties as a public officer. When his public service comes into play, his private service is for the time suspended.

Id. at 311-312.

An argument can be made that in today's world, large corporations that benefit from a notary employee's statutory violations should be vicariously responsible for those violations. Some states have adopted that position by statute. See, e.g., Fla. Stat. § 117.05 (6) ("The employer of a notary public shall be liable to the persons involved for all damages proximately caused by the notary's official misconduct, if the notary public was acting within the scope of his or her employment at the time the notary engaged in the official misconduct."). But the General Assembly has not done so, despite numerous revisions to Georgia's notary statutes over the years, including revisions that make clear that the legislature understands that notaries may work for banks and other corporations. See OCGA § 45-17-12 (b) (authorizing "any notary public who is . . . [an] employee of a bank or other corporation" to engage in most notarial acts regarding the corporation). To the contrary, our notary statutes recognize the view this Court took in *May v. Jones* that notaries are public officials whose duties to the public are superior to any private duties to their employers. See OCGA § 45-17-8 (b) ("No notary shall be obligated to perform a notarial act if he feels such act is: (1) For a transaction which the notary knows or suspects is illegal, false, or

deceptive; (2) For a person who is being coerced; (3) For a person whose demeanor causes compelling doubts about whether the person knows the consequences of the transaction requiring the notarial act; or (4) In situations which impugn and compromise the notary's impartiality . . . ."); OCGA § 45-17-8 (d) ("A notary public shall not execute a notarial certificate containing a statement known by the notary to be false nor perform any action with an intent to deceive or defraud.").[2]

Because no compelling reason has been presented for this Court to overrule *May v. Jones*, the second part of the first certified question must also be answered no.

(c) Thus, a corporation or other non-notary may not be *directly* liable for violations of OCGA § 45-17-11, and a corporation or other employer may not be *vicariously* liable for violations committed by an employee notary. But under well-established principles, the corporation (or other person) may still be liable if it *participates in or procures* the notary's violations. In terms of criminal liability, this is simply the concept of being a party to a crime. See OCGA § 16-2-20.[3]

---

[2] This view accords with the National Notary Association's Model Notary Act of 2010. See http://www.nationalnotary.org/userimages/2010_Model_Notary_Act.pdf. The Model Act extends liability to a notary's employer under the respondeat superior theory only "if the employer directed, expected, encouraged, approved, or tolerated the notary's [misconduct] either in the particular transaction or, impliedly, by the employer's previous action in at least one similar transaction involving any notary employed by the employer," Section 13.1 (c), or if the employer coerced or threatened the notary, Section 13.1 (d). The comments to Section 13.1, which the dissent overlooks, explain that this is not traditional, unlimited vicarious liability:

> [T]o reinforce the independence of the office, the drafters wanted to iterate the fact that a notary is first and foremost a public servant, whose duty to the public overrides obligations to an employer. An employer cannot control a notary's performance of official duties. Consequently, it would be unfair always to hold the employer accountable for the employee-notary's behavior. Thus, the Act only imposes liability on the employer where the employer's own actions caused, facilitated, or permitted the improper behavior.

[3] OCGA § 16-2-20 provides:

> (a) Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime.
> (b) A person is concerned in the commission of a crime only if he:
> (1) Directly commits the crime;
> (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity;
> (3) Intentionally aids or abets in the commission of the crime; or
> (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

The fact that the individual notary is not liable for some reason, or is not charged, would not preclude party liability. See OCGA § 16-2-21 ("Any party to a crime who did not directly commit the crime may be indicted, tried, convicted, and punished for commission of the crime upon proof that the crime was committed and that he was a party thereto, although the person claimed to have directly committed the crime has not been prosecuted or convicted, has been

Likewise, on the civil side, OCGA § 51-12-30 provides that "[i]n all cases, a person who maliciously procures an injury to be done to another, whether an actionable wrong or a breach of contract, is a joint wrongdoer and may be subject to an action either alone or jointly with the person who actually committed the injury." The Court of Appeals has explained that

> "[t]he word 'procure,' as used in OCGA § 51-12-30, does not require the lending of assistance in the actual perpetration of the wrong done by another; but if one, acting only through advice, counsel, persuasion, or command, succeeds in procuring any person to commit an actionable wrong, the procurer becomes liable for the injury, either singly or jointly, with the actual perpetrator."

*White v. Shamrock Bldg. Systems*, 294 Ga. App. 340, 349, n. 23 (669 SE2d 168) (2008) (citation and punctuation omitted). See also *City of Hawkinsville v. Wilson & Wilson*, 231 Ga. 110, 111 (200 SE2d 262) (1973) (noting that "one who procures or assists in the commission of an actionable wrong is equally liable with the actual perpetrator for the damages"). Thus, in *White*, the Court of Appeals concluded that a jury question existed as to whether a defendant corporation that did not owe a direct duty to the plaintiff could still be liable under OCGA § 51-12-30 for assisting one of its employees in violating a duty that the employee owed. See 294 Ga. App. at 347-349.

This Court's previous notary cases have endorsed this view. In *May v. Jones*, after rejecting vicarious liability, the Court noted that "[t]here is no allegation that the bank *participated* in the libelous protest, except the one above quoted," and added, "[d]oubtless the bank could render itself liable by maliciously *procuring* a false protest to be made." 88 Ga. at 312 (emphasis supplied). See also *State Mut. Life & Annuity Assn. v. Baldwin*, 116 Ga. 855, 857 (43 SE 262) (1903) (citing *May v. Jones* for the principle that, if a notary public commits libel, "not only he, but all other persons participating with him in such unlawful conduct, may be held accountable therefor in an action for libel"); *Peters v. Hyatt Legal Svcs.*, 211 Ga. App. 587, 594 (440 SE2d 222) (1993) (holding that an employer was not entitled to summary judgment on punitive damages claim because, among other things, there was evidence it directed its notary employee to "notarize documents without actually witnessing the signature or talking to the signor").

---

convicted of a different crime or degree of crime, or is not amenable to justice or has been acquitted.").

For these reasons, although a corporation cannot be directly or vicariously liable for a violation of OCGA § 45-17-11, it still may be liable if it procures or otherwise qualifies as a party to or participant in such a violation by a notary.[4]

We recognize that this holding goes beyond the exact question certified to us, but this case involves the scope of a corporation's liability for violations of the notary statute, and the Eleventh Circuit asked for this Court's broad assistance "[i]n the effort to decide this case correctly," adding that " '[l]atitude extends to the Supreme Court's restatement of the . . . issues and the manner in which the answers are given.' " *Anthony*, 583 F3d at 1307 (citation omitted). See also *Miller v. Harco Nat. Ins. Co.*, 274 Ga. 387, 389 (552 SE2d 848) (2001) ("The particular phrasing used in . . . [certified] questions does not restrict our consideration of the issues, any restatement thereof, or the manner in which the answers are given."). We leave it to the federal court to apply this holding in determining whether the Anthonys' complaint states a claim.

2. The second question posed by the Eleventh Circuit is whether, "[i]f a corporation employing notaries public is subject to [OCGA] section 45-17-11, does a private civil cause of action arise under that section to recover notarial fees paid in excess of, and without notice of, the statutorily-prescribed maximum notary fee?" The answer is clearly no.

(a) We are interpreting a penal statute, as any notary who executes a certificate containing a statement known by the notary to be false, or performs an act with the intent to deceive or defraud, is guilty of a misdemeanor. See OCGA § 45-17-20 (a).[5] And the notary statute does not contain an express private cause of action. Compare, e.g., OCGA § 46-4-160.5 (creating a private cause of action for retail consumers damaged by certain violations of the Natural Gas Competition and Deregulation Act). Thus, we look to our cases that explain when an implied private civil cause of action may arise from the violation of a penal statute.

---

[4] The dissent strangely intertwines the doctrines of vicarious and direct liability, assuming that a corporation could be vicariously liable for a statutory violation and concluding that the corporation must then also be directly liable for such a violation. This analysis turns vicarious liability on its head, because the liability of the " 'master . . . is entirely derivative from the servant's negligence.' " *Thomas v. Medical Center of Central Ga.*, 286 Ga. App. 147, 148 (648 SE2d 409) (2007) (citation omitted). Nevertheless, based on the dissent's unusual vicarious/direct liability analysis, the dissent appears to agree with our conclusion that a corporation may be liable if it participates in or procures a notary's violations.

[5] Subsection (b) of OCGA § 45-17-20 currently states that a first or second conviction for performing a notarial service in violation of the notary statute is a misdemeanor and any subsequent conviction is a felony, but that provision was added after the transaction at issue in this case.

The leading case is *Murphy v. Bajjani*, 282 Ga. 197 (647 SE2d 54) (2007). There we recognized that " '[c]ivil liability may be authorized where the legislature has indicated a strong public policy for imposing a civil as well as criminal penalty for violation of a penal statute.' " Id. at 201 (quoting *Key v. Grant*, 238 Ga. App. 818, 818 (520 SE2d 277) (1999)). We further explained, however, that the indication that the legislature meant to "impos[e] a civil as well as criminal penalty" must be found *in the provisions of the statute* at issue, not extrapolated from the public policy the statute generally appears to advance.

> There is no indication that the legislature intended to impose civil liability in addition to the criminal sanctions set forth in a statute where, as here, nothing *in the provisions of the statute* creates a private cause of action in favor of the victim purportedly harmed by the violation of the penal statute. *Troncalli v. Jones*, 237 Ga. App. 10 (1) (514 SE2d 478) (1999) (enactment of criminal stalking statute did not create a tort of stalking); *Vance v. T. R. C.*, 229 Ga. App. 608 (1) (a) (494 SE2d 714) (1997); *Cechman v. Travis*, 202 Ga. App. 255 (1) (414 SE2d 282) (1991) (penal statute requiring report of suspected child abuse does not create a private cause of action in tort in favor of child whose abuse was not reported). *While OCGA § 20-2-1184 establishes Georgia's public policy* concerning the need to report timely to the appropriate authorities the identity of students who commit certain proscribed acts on school grounds, *it does not create a civil cause of action for damages in favor of the victim or anyone else* for the purported failure to report timely.

*Murphy*, 282 Ga. at 201 (emphasis supplied).

This focus on the text of the statute, rather than on the public policy reflected in the statute, is consistent with Court of Appeals decisions both before and after *Murphy*. Thus, in *Rolleston v. Huie*, 198 Ga. App. 49, 50 (400 SE2d 349) (1990), the plaintiff asserted that the theft by extortion statute, which prohibits threats to disseminate information tending to impair another person's credit or business reputation, created a private civil cause of action. See id. at 50; OCGA § 16-8-16 (a) (3). The Court of Appeals held that,

> [a]lthough OCGA § 16-8-16 establishes the public policy of this state, *nothing within its provisions* purports to create a private cause of action in tort in favor of an alleged victim. Accordingly, the civil liability of [the defendant] must be determined under the applicable provisions of the tort law

of this state, not the inapplicable criminal provisions of OCGA § 16-8-16.

*Rolleston*, 198 Ga. App. at 50 (emphasis supplied).

Similarly, in *Verdi v. Wilkinson County*, 288 Ga. App. 856, 857-858 (655 SE2d 642) (2007), the plaintiff alleged that a private civil cause of action arose from the statute that protects grave sites by making it a felony to maliciously remove or disturb human remains. See id. at 857-858; OCGA § 31-21-44. The Court of Appeals held "[t]here is no indication that the legislature intended to impose civil liability in addition to the criminal sanctions set forth in OCGA § 31-21-44 because *'nothing in the provisions of the statute* creates a private cause of action in favor of the victim purportedly harmed by the violation of the penal statute.' " *Verdi*, 288 Ga. App. at 858 (quoting *Murphy*, 282 Ga. at 201 (emphasis supplied)).

Further review of the case law demonstrates that the public policy advanced *by* a penal statute, no matter how strong, cannot support the implication of a private civil cause of action that is not based on the actual provisions *of* the relevant statute. Thus, in *Murphy*, this Court cited with approval two Court of Appeals cases, *Vance* and *Cechman*, that held that no private cause of action arose from the violation of OCGA § 19-7-5, which makes it a crime for certain people to fail to report suspected child abuse. See *Murphy*, 282 Ga. at 201. In both cases, the Court of Appeals held that there was nothing in OCGA § 19-7-5 that purported to create a private tort cause of action in favor of a child whose abuse was not reported. See *Vance*, 229 Ga. App. at 610-611; *Cechman*, 202 Ga. App. at 256. Accord *McGarrah v. Posig*, 280 Ga. App. 808, 810 (635 SE2d 219) (2006); *Fulton-DeKalb Hosp. Auth. v. Reliance Trust Co.*, 270 Ga. App. 822, 823 (608 SE2d 272) (2004).

Protecting children through the mandated reporting of suspected child abuse advances a public policy of surpassing strength — but that is not enough, under the case law, to justify implying a private civil cause of action. Thus, while Georgia public policy is against excessive charges by notaries public (although not strongly enough for the General Assembly to have made its enforcement by criminal sanctions directly applicable to corporations or other nonnotaries), that policy in itself cannot support a private civil cause of action, as there is absolutely "nothing in the provisions of" OCGA § 45-17-11, *Murphy*, 282 Ga. at 201, that shows that the Legislature meant to authorize such civil actions.

This reticence to create implied civil rights to sue based upon penal statutes runs throughout Georgia's appellate case law, as shown by the cases cited above and many others, which again often involved very strong public policies. See, e.g., *Cox Broadcasting Corp.*

*v. Cohn*, 231 Ga. 60, 61-62 (200 SE2d 127) (1973) (holding that, although Georgia statute that created criminal liability for the disclosure of a rape victim's identity established the State's public policy on the subject, it did not create a private cause of action for damages in favor of the victim), reversed on other grounds, 420 U. S. 469 (95 SC 1029, 43 LE2d 328) (1975); *Smith v. Chemtura Corp.*, 297 Ga. App. 287, 294-295 (676 SE2d 756) (2009) (no private cause of action created by violation of various criminal statutes); *Chisolm v. Tippens*, 289 Ga. App. 757, 761 (658 SE2d 147) (2008) (violation of cruelty to children statute, OCGA § 16-5-70, does not create a private cause of action); *Jastram v. Williams*, 276 Ga. App. 475, 476 (623 SE2d 686) (2005) (violations of OCGA §§ 16-10-26 and 16-10-24, which make it a crime to knowingly give a false crime report to police and to knowingly obstruct a police officer, do not create a private cause of action); *Doyle Dickerson Co. v. Durden*, 218 Ga. App. 426, 428 (461 SE2d 902) (1995) (no private cause of action based on violation of OCGA § 16-8-15, which makes it a crime to use the proceeds of payment for the purpose of improving certain real property for certain other purposes); *Oswald v. American Nat. Can Co.*, 194 Ga. App. 882, 883 (392 SE2d 26) (1990) (willful failure to provide W-2, which can result in criminal liability, does not create private cause of action).

In short,

> "[c]riminal statutes, which express prohibitions rather than personal entitlements and specify a particular remedy other than civil litigation, are accordingly poor candidates for the imputation of private rights of action." The criminal statutes at issue create rights in favor of the general public, not just individuals damaged by their violation.

*Jastram*, 276 Ga. App. at 476 (citations omitted).

(b) In the face of this case law, the Anthonys contend that this case is analogous to *Norris v. Sigler Daisy Corp.*, 260 Ga. 271 (392 SE2d 242) (1990). They claim that in *Norris* this Court held that a violation of the criminal usury statute, OCGA § 7-4-18, gives rise to an implied civil cause of action to recover excess interest paid. That is a misreading of *Norris*. To begin with, *Norris* did not discuss any of the case law regarding when the violation of a criminal statute creates a private civil cause of action. Instead, *Norris* relied exclusively on two prior decisions of the Court of Appeals that looked to the criminal usury statutes (the predecessors to the statutes at issue in *Norris*) to determine what interest was legal and thus what illegal interest could be recovered as a civil forfeiture under the statute *expressly* providing for such forfeiture. *Norris* cited *Citizens Bank v. Hoyt & Co.*, 25 Ga. App. 222 (102 SE 837) (1920), and *Croom v. Jordan*, 20 Ga. App. 802

(93 SE 538) (1917), for the proposition that "a loan violative of the criminal usury statute is illegal, with the result that the lender forfeits the interest but may collect the principal." 260 Ga. at 272.

Neither of those cases found the existence of an *implied* private cause of action. In *Croom*, the plaintiff sought to recover the principal and legal interest on a loan to the defendant. See 20 Ga. App. 802. The defendant responded that the plaintiff had charged interest of over 5% per month, a misdemeanor under then Civil Code § 3444 (now OCGA § 7-4-18 (a)), that the loan was void, and that the plaintiff therefore had forfeited his right to collect the principal and interest. See 20 Ga. App. 802. The Court of Appeals, however, explained that the criminal usury statute was not meant to provide a forfeiture remedy beyond the existing civil forfeiture remedy expressly provided by then Civil Code § 3438 (now OCGA § 7-4-10 (a)), which stated that a lender charging interest over the 8% per year permitted by then Civil Code § 3436 (now OCGA § 7-4-2)), forfeited only the right to collect the excess interest. See *Croom*, 20 Ga. App. at 804-805. The *Croom* court therefore held that the lender could recover the principal and legal interest from the borrower, forfeiting the illegal interest. See id. at 805. (Today OCGA § 7-4-10 (a) provides that the lender forfeits all interest, not just the excess interest, if it charges more than the 7% per year permitted by OCGA § 7-4-2 (a).) In *Citizens Bank*, the Court of Appeals simply followed *Croom*. See 25 Ga. App. at 224-225.

Thus, as *Croom* and other cases have explained, the purpose of the criminal usury statute was not to alter the existing civil forfeiture provisions by creating a new cause of action for the forfeiture of all principal and interest, but instead to enhance the existing forfeiture remedy "by adding the criminal penalty of misdemeanor" when the interest rate was particularly exorbitant. *Wall v. Lewis*, 192 Ga. 652, 653 (16 SE2d 430) (1941). The purpose of enacting both the civil forfeiture and criminal penalty provisions of the usury statutes "was to provide generally for the forfeiture of all interest which exceeded 8 per cent. per annum . . . and [to provide] that, when such charge of interest exceeded more than 5 per cent. per month, it became a criminal offense." Id.

*Norris* did not alter this law. The dispositive issue in *Norris* was whether the definition of interest contained in OCGA § 7-4-18, which differed from the definition in OCGA § 7-4-2, could be relied on to determine whether the lender had charged a usurious rate of interest. See 260 Ga. at 272-273. The Court ruled that it could and that the interest exceeded 5% per month and thus violated OCGA § 7-4-18 (a). See 260 Ga. at 272-273. The Court then relied on the rationale of *Citizens Bank*, *Croom*, and *Childs v. Liberty Loan*

*Corp.*, 144 Ga. App. 715, 716 (242 SE2d 354) (1978), to conclude that the lender was required to *forfeit* the usurious interest. See *Norris*, 260 Ga. at 271-272 and 273-274. The Anthonys' error in claiming that *Norris* found an implied civil cause of action based on the violation of a penal statute is further demonstrated by *Norris*'s reliance on *Childs* for the holding that " '[o]ne who lends at a usurious rate forfeits the interest and other charges for making the loan.' " 260 Ga. at 273 (quoting *Childs*, 144 Ga. App. at 716). *Childs*, in turn, relied on Code Ann. § 57-112 (now OCGA § 7-4-10) for that proposition — a statute that *expressly* creates a civil forfeiture remedy against usurious interest.

The Anthonys correctly note that in *Murphy*, we cited *Norris* as an example of when strong public policy supports imposing civil, as well as criminal, liability for the violation of a penal statute. See *Murphy*, 282 Ga. at 201. *Norris* is such an example, but as shown by the discussion of *Norris*'s reasoning and roots, that was because there was an underlying statute that expressly imposed civil liability for the usurious interest at issue. *Norris* should not be read to authorize the creation of an implied civil cause of action when there is nothing in the provisions of the penal statute at issue that purports to create a private cause of action.

The Anthonys also rely on *Borison v. Christian*, 257 Ga. App. 257 (570 SE2d 696) (2002). In *Borison*, however, the Court of Appeals did not apply the proper standard for implying a civil cause of action from a penal statute. Instead, it extrapolated *Norris* to allow a private civil action to recover excessive amounts charged for bail bond, 257 Ga. App. at 258, even though, unlike in *Norris* and the cases upon which *Norris* relied, there is no express civil forfeiture remedy for such excessive bond charges.

(c) Finally, it is worth noting that the General Assembly appears to be so concerned about the judicial creation of implied civil causes of action that it recently enacted OCGA § 9-2-8 (a), which states that "[n]o private right of action shall arise from any Act enacted after the effective date of this Code section unless such right is expressly provided therein." S.B. 138, 2009-2010 Legislative Session (Ga. 2010) (passed April 27, 2010; signed by Governor June 2, 2010). The new law would not apply to the pre-existing statute at issue in this case, but it certainly counsels against deviating from our established precedent to find new implied civil causes of action.

(d) For these reasons, we answer the second certified question no: a private civil cause of action may not be implied to remedy a violation of OCGA § 45-17-11. We note that the dissent's contrary conclusion ignores *Murphy* and the wealth of precedent that under-mines its position and again simply reflects a policy judgment that,

while not unreasonable, is not supported by the actual provisions of the statute the General Assembly enacted.

This does not necessarily mean that the Anthonys are without any remedy, as they may be able to pursue civil liability against American General under other applicable tort or contract laws of this State. See *Rolleston*, 198 Ga. App. at 50. See also OCGA § 9-2-8 (b) (S.B. 138 above) (providing that "[n]othing in subsection (a) shall be construed to prevent the breach of any duty imposed by law from being used as the basis for a cause of action under any theory of recovery otherwise recognized by law, including, but not limited to, theories of recovery under the law of torts or contract or for breach of legal or private duties as set forth in Code Sections 51-1-6 and 51-1-8 or in Title 13"). We express no opinion on the viability of such other potential theories of liability.

3. The third question certified by the Eleventh Circuit is whether,

> [i]f a corporation employing notaries public is subject to [OCGA] section 45-17-11, does the voluntary payment statute, [OCGA] section 13-1-13, bar contract recovery for notarial fees paid in excess of, and without notice of, the statutorily-prescribed maximum notary fee when the actual fee charged was clearly specified in the contract and the contract represents that the fees are "reasonable and necessary"?

We conclude that a breach of contract claim asserted under these particular circumstances is not barred by the voluntary payment doctrine.

Under the voluntary payment doctrine, a party may not recover for payments made "through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party," with some narrow exceptions not applicable here. OCGA § 13-1-13. Despite the express and affirmative statutory duty to disclose that the notary fee could not exceed $4.00, see OCGA § 45-17-11 (d), the contract at issue expressly and affirmatively misrepresented that the $350 notary fee imposed was "reasonable and necessary." This unusual combination of circumstances renders the voluntary payment doctrine inapplicable, at least in the context of a motion to dismiss the complaint, as the complaint alleges sufficient "artifice, deception, or fraudulent practice" by American General (assuming the corporation is deemed liable for a violation of OCGA § 45-17-11 (d) under the holding in Division 1 above).

4. The fourth and final question certified by the Eleventh Circuit is whether,

> [i]f a corporation employing notaries public is subject to [OCGA] section 45-17-11, is the statute of limitations tolled on fraud and money had and received claims when notarial fees are collected in excess of, and without providing the required notice of, the statutorily-prescribed maximum notary fee when the contract represents that the fees are "reasonable and necessary"?

The answer is no.

"If the defendant . . . [is] guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." OCGA § 9-3-96. In order to toll the statute of limitation, the fraud "must be such actual fraud as could not have been discovered by the exercise of ordinary diligence. This rule is applied even where actual fraud is the gravamen of the action." *Bahadori v. National Union Fire Ins. Co.*, 270 Ga. 203, 205 (507 SE2d 467) (1998) (citations omitted). Assuming, arguendo, actual fraud in American General's failure to disclose the statutory maximum fee for notarial services as required by OCGA § 45-17-11 (d) and its representation in the loan agreement that a fee dramatically exceeding this maximum was "reasonable and necessary," the Anthonys were not prevented from subsequently discovering the impropriety of these actions by simple reference to OCGA § 45-17-11 of the readily-available Georgia Code. Thus, the four-year statute of limitation on claims of fraud, see OCGA § 9-3-31; *McKesson Corp. v. Green*, 299 Ga. App. 91, 96, n. 21 (683 SE2d 336) (2009), and on claims of money had and received, see OCGA § 9-3-25; *Baghdady v. Central Life Ins. Co.*, 224 Ga. App. 170, 171, n. 1 (480 SE2d 221) (1996), would not be tolled.

*Questions answered. All the Justices concur, except Hunstein, C. J., and Benham and Thompson, JJ., who concur in part and dissent in part.*

HUNSTEIN, Chief Justice, concurring in part and dissenting in part.

I concur in Divisions 3 and 4 of the majority opinion. However, because I would hold that a corporation employing notaries public to facilitate its lending practices may be subject directly to OCGA § 45-17-11 pursuant to a private civil cause of action, I must respectfully dissent to Divisions 1 and 2.

The nature of a notarial act[6] is such that it must be performed by an individual, and Chapter 17 of Title 45 is written accordingly. See, e.g., OCGA § 45-17-2 (qualifications of notaries). However, the Legislature clearly intended to protect *consumers* of notarial services by, inter alia, establishing and requiring notification of a maximum fee that can be charged for a given act. See OCGA § 45-17-11. Here, the $350 notary fee was set out in a loan agreement drafted by American General; the notary public was not responsible for the content of the contract. OCGA § 45-17-8 (f) (notary's signature does not evidence knowledge of document's contents). Moreover, the fee was paid to American General; the notary public did not receive any of the funds. Under these circumstances, it would defeat the clear intent of the Legislature in enacting OCGA § 45-17-11 not to hold American General directly accountable under the statute for a violation thereof. See *Echols v. Thomas*, 265 Ga. 474, 475 (458 SE2d 100) (1995) ("[a]lthough appellate courts generally do not construe statutory language that is plain and unequivocal, judicial construction is required when words construed literally would defeat the legislature's purpose"). Where, as here, the alleged statutory violation results solely from the actions of the corporation itself, there is no issue of vicarious liability.

As the majority notes in Division 1 (b), the Model Notary Act of 2010 provides for respondeat superior liability as follows:

> An employer of a notary is liable to any person for all damages proximately caused that person by the notary's negligence, intentional violation of law, or official misconduct in performing a notarization during the course of employment, if the employer directed, expected, encouraged, approved, or tolerated the notary's negligence, violation of law, or official misconduct either in the particular transaction or, impliedly, by the employer's previous action in at least one similar transaction involving any notary employed by the employer.

See http://www.nationalnotary.org/userimages/2010_Model_Notary_Act.pdf, Section 13-1 (c). Maj. Op. at 452, n. 2. Thus, as explained in the comments to Section 13-1, "the Act only imposes liability on the employer where the employer's own actions caused, facilitated, or permitted the improper behavior." If an employer would be vicari-

---

[6] " 'Notarial act' means any act that a notary public is authorized by law to perform and includes, without limitation, attestation, the taking of an acknowledgment, the administration of an oath or affirmation, the taking of a verification upon an oath or affirmation, and the certification of a copy." OCGA § 45-17-1 (2).

ously liable for its employee notary's misconduct under such circumstances, the imposition of direct liability for a statutory violation is certainly appropriate where, as here, it is the employer itself that engages in the misconduct rather than the notary employee.

A private civil cause of action should arise where the violation of OCGA § 45-17-11 is attributable to a corporation rather than an individual, as the statutorily-prescribed remedies of criminal prosecution[7] or administrative rebuke[8] are insufficient to promote corporate compliance therewith. Absent imposition of civil liability for a corporation's violation of the statute, the legislative intent to protect consumers of notarial services that underlies OCGA § 45-17-11 would be substantially impaired.

Accordingly, I would answer certified questions 1 (A) and 2 in the affirmative.

DECIDED JUNE 28, 2010.

*Daughtery, Crawford, Fuller & Brown, Jason L. Crawford, James C. Fuller, Dustin T. Brown, Trammell, Camp & Lewis, Robert T. Trammell, Jr.*, for appellants.

*Hunton & Williams, Lawrence J. Bracken II, Bryan A. Powell, Charlotte M. Wheeler*, for appellees.

*David A. Webster, Charles R. Bliss, John R. Bartholomew IV, Anna-Elisa Mackowiak*, amici curiae.

---

[7] Under the current version of OCGA § 45-17-20 (a), a first or second conviction for performing a notarial service in violation of the statute is a misdemeanor and any subsequent conviction is a felony. A corporation may only be prosecuted for a crime under certain circumstances. See OCGA § 16-2-22 (a) (2).

[8] The appointing superior court clerk may revoke the commission or deny the reappointment of a notary public who violates any provision of the notary statute. OCGA § 45-17-15 (a) (1).